

**ORDERED in the Southern District of Florida on May 9, 2016.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:                                                          Case No. 12-30081-EPK

CLSF III IV, INC. *et al.*,                        Chapter 7
                                                                (Jointly Administered)

    Debtors.
_____/

### ORDER GRANTING TRUSTEE'S MOTIONS FOR SANCTIONS AND HOLDING ARTHUR MARK FEUERBORN IN CONTEMPT OF COURT

THIS MATTER came before the Court for hearing on March 15 and April 8, 2016 upon the *Trustee's Motion for Sanctions Against Law Offices of Arthur Mark Feuerborn & Associates, and Arthur Mark Feuerborn* [ECF No. 1264] (the "Sanctions Motion"), the *Trustee's Motion for an Order Holding Arthur Mark Feuerborn, Individually and DBA the Law Offices of Arthur Mark Feuerborn & Associates, in Contempt of Court for Violation of the Court's Order on Order to Show Cause Directed to the Law Offices of Arthur Mark Feuerborn & Associates and Arthur Mark Feuerborn* [ECF No. 1297] (the "Contempt Motion"), and the *Trustee's Expedited Motion to Compel Production of Documents from Arthur Mark Feuerborn, in Response to Trustee's Request for Production of Documents*

*Directed to Arthur Mark Feuerborn* [ECF No. 1307] (the "Motion to Compel") (collectively, the "Feuerborn Motions") filed by Deborah C. Menotte, Chapter 7 Trustee (the "Trustee"). In the Feuerborn Motions, among other things, the Trustee requests that the Court order sanctions against Arthur Mark Feuerborn, Esq. and hold Mr. Feuerborn in contempt of court as a result of various actions allegedly in violation of orders of this Court. For the reasons stated below, the Court grants each of the Feuerborn Motions.

**Background**

Arthur Mark Feuerborn is an attorney who currently resides and practices in California.

The Feuerborn Motions arise in the context of the Trustee's ongoing investigation, now several years in process, into an insolvent investment scheme the Trustee refers to as the "Quality Investments Scheme."

The Quality Investments Scheme involved the sale to investors in Europe of indirect interests in life insurance policies insuring the lives of American individuals. European investors purchased participation interests in Dutch investment funds. Each Dutch investment fund became the beneficiary of a United States trust that either held directly a single life insurance policy on an American individual along with related reinsurance and funds necessary to service the policy, or was the sole owner of a United States corporation that held such assets. The debtors and substantively consolidated entities in these jointly administered bankruptcy cases are some of the trusts and corporations involved in the Quality Investments Scheme. In theory, at least, the funds invested by the European investors were to be used by the debtors and related entities to acquire and maintain the subject life insurance policies. Based on the Trustee's investigation to date, it appears that the Quality Investments Scheme was a massive fraud. Among other malfeasance, the leaders of the scheme diverted money from the investment funds for their personal use,

leaving insufficient amounts to service the underlying life insurance policies, causing them to lapse and thereby lose the primary value of the proposed investment. In the end, hundreds of millions of dollars were lost.

This bankruptcy case was commenced on August 22, 2012 with the filing of an involuntary petition under chapter 7 of the Bankruptcy Code.[1] Over the next several months, dozens of affiliated entities filed voluntary bankruptcy petitions. The Court eventually substantively consolidated CLSF III IV, Inc. with its affiliates and certain other non-debtor entities, setting a petition date of September 25, 2012 for all purposes. The Trustee thereupon began to investigate all of the related entities and players in the Quality Investments Scheme, with the goal of recovering the lost funds for the estate.

The Trustee identified several intermediaries employed by the principals of the Quality Investments Scheme to obtain life insurance policies. Sunstar Financial, LLC ("Sunstar"), an entity owned and operated by Reed Collingwood, was one such intermediary. Sunstar and Mr. Collingwood were not licensed as insurance brokers and had no legal right to commissions or fees. Nevertheless, Sunstar and Mr. Collingwood operated as brokers in the purchase and sale of life insurance policies. Together, they caused the investment funds to pay excessive amounts for the purchase of certain insurance policies. Simultaneously, they charged purported commissions in gross excess of the industry standard for licensed brokers. Furthermore, Mr. Collingwood and Sunstar received such payments as the scheme was collapsing, including significant sums transferred after the commencement of this bankruptcy case. Ultimately, Mr. Collingwood and Sunstar received over $1.4 million in pre-petition fraudulent transfers and unauthorized post-petition transfers from debtor entities.

---

[1] 11 U.S.C. §§ 101 *et seq.*

Beginning in September 2012, Mr. Feuerborn acted as a purported escrow agent in connection with insurance policy transfers later found to be in violation of orders of this Court.  Mr. Feuerborn apparently also acted as escrow agent and private banker in connection with other transactions contemplated by Mr. Collingwood and Sunstar over the past several years.  In the course of his business with Mr. Collingwood and Sunstar, beginning in 2012, Mr. Feuerborn routinely held funds on their behalf, which he disbursed at their request.  It is not disputed that Mr. Feuerborn regularly disbursed escrow funds and other funds to or on behalf of Mr. Collingwood without specific authorization from any other person or entity.  It is also not disputed that Mr. Feuerborn performed this service without regard to the existence of, or content of, agreements formalizing his role and obligations as an escrow agent.  Finally, it is also not disputed that at no point did Mr. Feuerborn formally represent Mr. Collingwood or Sunstar as an attorney.  Whether or not there is an acceptable business or legal purpose for Mr. Feuerborn's activities in this case is a matter of some dispute, as described in further detail below.

**The Sanctions Motion**

### Additional Background

By mid-2013, the Trustee was investigating Mr. Collingwood and Sunstar in connection with their involvement in the Quality Investments Scheme.  Mr. Collingwood and Sunstar refused to cooperate with the investigation.  No later than August, 2013, Mr. Feuerborn became aware of the Trustee's investigation when the Trustee subpoenaed Mr. Feuerborn as part of her discovery attempts against Mr. Collingwood and Sunstar.

The Trustee filed appropriate motions to compel compliance with discovery requests and for sanctions against Sunstar, to which Mr. Collingwood and Sunstar largely did not respond.  At hearings on December 5, 2013 and January 9, 2014, Mr. Feuerborn attempted to appear by telephone on Sunstar's behalf in defense against one of the Trustee's motions

4

for sanctions.  *See* ECF No. 672 (granting motion for order to show cause and awarding sanctions).  The Court noted at that time that Mr. Feuerborn was not admitted to practice law in Florida and had not requested to appear *pro hac vice* in this case.  Accordingly, the Court did not permit Mr. Feuerborn to speak on Sunstar's behalf.  The Court ordered sanctions against Sunstar in the amount of $7,626.00.  *Id.*

Sanctions against Sunstar and Mr. Collingwood quickly grew.  When Sunstar failed to pay the sanction granted on January 9, 2014, the Trustee filed a motion to hold Sunstar in contempt of court.  ECF No. 710.  Sunstar did not defend against the contempt motion, and the Court increased the sanction to $26,202.50 in addition to a separate $14,700.00 sanction for failure to respond to a related subpoena.  ECF No. 761.  The Court later extended the $7,626.00 portion of these sanctions to Mr. Collingwood jointly and severally with Sunstar.  ECF No. 824.

As the Trustee accelerated the investigation and pursued sanctions and collection against Mr. Collingwood and Sunstar in 2014, Mr. Feuerborn continued to hold significant sums of money in his own trust accounts, which he disbursed to Mr. Collingwood and Sunstar on a regular basis.  Between January, 2014 and November 2015, Mr. Feuerborn sent Mr. Collingwood and Sunstar regular payments, via wire transfer, totaling $5,000 to $30,000 per month.  Tr. Exh. 4 (trust account ledgers).[2]

Emails between Mr. Feuerborn and Mr. Collingwood show that Mr. Feuerborn sent the money on request from Mr. Collingwood, with no explanation, business or otherwise, provided for the requests.  Ultimately, over the course of nearly two years during the Trustee's investigation, Mr. Feuerborn held and disbursed to or on behalf of Mr. Collingwood nearly $300,000.  All of this sum was disbursed during a period in which Mr.

---

[2] The Court admitted eleven (11) exhibits for consideration in relation to the Feuerborn Motions. The Trustee's exhibit register is on file in this case at ECF No. 1323.

Feuerborn had been made aware of court orders obligating Mr. Collingwood and Sunstar to pay large sums to the Trustee.

On August 21, 2014, the Trustee filed suit against Mr. Collingwood and Sunstar seeking to avoid $1.4 million in fraudulent transfers and unauthorized post-petition transfers.  Mr. Collingwood and Sunstar did not respond to the Trustee's complaint.  On December 8, 2014, the Court entered a final default judgment against Sunstar in the amount of over $1.6 million, which included pre-judgment interest. On February 3, 2015, the Court entered a similar default judgment against Mr. Collingwood.  Mr. Collingwood and Sunstar appealed the judgments, and the appeals were dismissed.  The judgments are now final and unappealable.  *See generally* Adv. Proc. No. 14-01595-EPK.

The Trustee has been largely unable to collect on the court orders and judgments against Mr. Collingwood and Sunstar.  In April of 2015, Mr. Collingwood provided a signed financial statement to the Trustee showing that his assets consisted of $20,000 in household furnishings and $166 in cash.

On July 31, 2015, the Trustee issued a subpoena to Mr. Feuerborn,[3] commanding production of the following:

> 1.  All non-privileged documents concerning any real, tangible, and/or intangible property held or owned by Sunstar.
> …
> 3.  All documents concerning payment and/or transfers of funds related to Your representation of Sunstar.
> 4.  All documents concerning payments and/or transfers of funds made to third parties on behalf of Sunstar or at Sunstar's direction.
> …
> 6.  All non-privileged documents concerning any real, tangible, and/or intangible property held or owned by Collingwood.
> …

---

[3] This subpoena, as well as some other filings and documents in this case, refer to "The Law Offices of Arthur Mark Feuerborn & Associates."  At the hearing on March 15, 2016, Mr. Feuerborn confirmed to the Court that he is the sole proprietor of his legal practice and its only professional. The legal practice is not a corporate entity and thus has no identity separate from Mr. Feuerborn. For the remainder of this Order, the Court refers only to Mr. Feuerborn, individually.

8. All documents concerning payment and/or transfers of funds related to Your representation of Collingwood.

...

11. All documents concerning payments and/or transfers of funds made to third parties on behalf of Collingwood or at Collingwood's direction.

ECF No. 1225, Exh. A. Among other things, this document request covers documents relating to all assets held by Mr. Feuerborn on behalf of Sunstar or Mr. Collingwood, and documents relating to all payments made by Mr. Feuerborn to or for the benefit of Sunstar or Mr. Collingwood. Mr. Feuerborn had an ongoing duty to supplement any response he might have made to this document request.

In his response to the subpoena on August 24, 2015, Mr. Feuerborn claimed that he was an "independent third-party holder of escrowed funds," and thus did not represent Mr. Collingwood or Sunstar. Nevertheless, Mr. Feuerborn also objected to the request on the basis of attorney-client privilege. Mr. Feuerborn did not provide a privilege log. Mr. Feuerborn's response contained substantially no information regarding assets held on behalf of Mr. Collingwood or Sunstar. Likewise, Mr. Feuerborn's response made no mention of the more than $200,000 he had transferred to Mr. Collingwood and Sunstar in the previous two years. *Id.* at Exh. B. Nor did Mr. Feuerborn ever alert the Trustee to the more than $60,000 he transferred to Mr. Collingwood and Sunstar after receiving the subpoena. Tr. Exh. 1.

Mr. Feuerborn does not now dispute that he possessed at all relevant times documents concerning the transfers he made to Mr. Collingwood and Sunstar, which were not privileged, and which clearly indicated that he held funds on behalf of Sunstar and/or Mr. Collingwood and made substantial payments at Mr. Collingwood's request. In other words, as Mr. Feuerborn conceded at the evidentiary hearing on April 8, 2016, his response to the Trustee's subpoena was untruthful. Mr. Feuerborn offered no credible explanation for his conduct.

The Trustee, suspicious of Mr. Feuerborn's response, moved to compel compliance with the subpoena. On October 30, 2015, the Court entered an order compelling compliance. ECF No. 1216. That order required Mr. Feuerborn to produce documents related to transfers to Mr. Collingwood and Sunstar and to produce a privilege log or otherwise waive all claims of privilege. The Court also ordered sanctions against Mr. Feuerborn in an amount more than $4,000 for his failure to respond to the subpoena, and required payment within 14 days.

Mr. Feuerborn did not comply with the Court's order at ECF No. 1216. In fact, in early November 2015, shortly after the order was entered, Mr. Feuerborn wired over $17,000 to Mr. Collingwood. Nearly simultaneously, Mr. Feuerborn dissipated his own assets by obtaining cashier's checks from his bank allegedly for the purpose of paying some $15,000 in state franchise taxes that were not in fact due at that time. At the evidentiary hearing on April 8, 2015, Mr. Feuerborn offered the not-at-all credible explanation that he paid his taxes early because he happened to be at the bank and it was convenient. Mr. Feuerborn did not provide any documentary evidence indicating that he had in fact made payment to any tax authority.

After Mr. Feuerborn failed to meet the Court's deadline for compliance under the order at ECF No. 1216, the Trustee moved for an order to show cause why Mr. Feuerborn should not be held in contempt and subject to additional sanctions. On December 11, 2015, the Court entered its *Order to Show Cause Directed to the Law Offices of Arthur Mark Feuerborn & Associates and Arthur Mark Feuerborn* [ECF No. 1250] (the "Order to Show Cause") awarding additional sanctions and requiring Mr. Feuerborn to appear before the Court in January 2016.

Faced with Mr. Feuerborn's continuing resistance to discovery, in December 2015 the Trustee subpoenaed MUFG Union Bank, N.A. to procure records of wire transfers made

by Mr. Feuerborn to Mr. Collingwood. Mr. Feuerborn moved to quash the bank subpoena. ECF No. 1256. The Court denied the motion to quash. ECF No. 1281. MUFG Union Bank, N.A. complied with the subpoena, revealing that Mr. Feuerborn had made the many wire transfers to or at the direction of Mr. Collingwood and Sunstar, referenced above. It is obvious that Mr. Feuerborn's attempt to obtain an order quashing the Trustee's subpoena of MUFG Union Bank, N.A. was interposed solely to stymie the Trustee's investigation into funds held by Mr. Feuerforn for the benefit of Mr. Collingwood and Sunstar.

On December 28, 2015, the Trustee filed the Sanctions Motion [ECF No. 1264]. In the Sanctions Motion, the Trustee alleges that during the period that the Trustee was seeking and obtaining judgments against Mr. Collingwood and Sunstar, Mr. Feuerborn was holding money for Mr. Collingwood and Sunstar so that Mr. Collingwood and his entity could evade collection by the Trustee. Furthermore, the Trustee alleges that Mr. Feuerborn intentionally obstructed the Trustee's discovery process, concealed assets on behalf of Mr. Collingwood, and intentionally violated Court orders. Mr. Feuerborn did not file a written response to the Sanctions Motion.

Via testimony at the evidentiary hearing on March 15, 2016, Mr. Feuerborn attempted to explain his role in Mr. Collingwood's life insurance policy transactions in as benign terms as possible. Mr. Feuerborn argued that he is a practitioner of family law who happened to meet Mr. Collingwood through a mutual friend. Mr. Collingwood asked Mr. Feuerborn to act as an independent, third-party intermediary for insurance policy transactions in which Mr. Collingwood and/or his company would act as broker. According to Mr. Feuerborn, Mr. Collingwood would connect buyers and sellers for insurance policies.

Mr. Feuerborn's involvement in each potential transaction began when Mr. Collingwood obtained a down payment from the potential buyer of a life insurance policy. That down payment would be sent to Mr. Feuerborn for deposit in his trust account,

apparently whether or not Mr. Feuerborn signed an escrow agreement formalizing his role. According to Mr. Feuerborn, Mr. Collingwood would then perform due diligence on the relevant insurance policy or policies, sometimes with the assistance of other persons or entities. Mr. Feuerborn had no direct involvement in this process and was unable to identify any party involved other than Mr. Collingwood.

According to Mr. Feuerborn, Mr. Collingwood would charge fees both as broker and for his due diligence work. Mr. Collingwood would direct Mr. Feuerborn to pay Mr. Collingwood, typically by e-mail. Although he offered no documentary or other proof on the issue, Mr. Feuerborn suggested that all such sums represented brokerage or due diligence fees payable to Mr. Collingwood.

Mr. Feuerborn's trust account ledgers reflect that some payments were sent to Sunstar and some to Mr. Collingwood. Tr. Exh. 4. But the wire transfer records indicate that all of the payments were sent to "Collingwood & Associates." Tr. Exh. 1. In any case, although Sunstar was the party identified in the handful of escrow agreements admitted in evidence, there is no doubt that Mr. Collingwood was the ultimate recipient of the payments made by Mr. Feuerborn. Indeed, Mr. Feuerborn believed this was the case. The Court notes that most of the funds wired to Mr. Collingwood were related to transactions that did not close, and the amounts of the wire transfers were typically large, round figures, such as $10,000. Mr. Feuerborn also occasionally paid himself.[4]

Mr. Feuerborn testified that it did not occur to him to inquire as to whether the potential buyers might have an interest in the funds he was wiring to Mr. Collingwood, or even that such parties might want to know of such transfers. Mr. Feuerborn testified that he assumed Mr. Collingwood would take care of paying whoever needed to be paid and, as

---

[4] The Court heard minimal evidence concerning the amounts paid to Mr. Feuerborn himself. The handful of escrow agreements admitted in this case do not specifically permit such payments.

far as Mr. Feuerborn knew, only one potential buyer had ever asked for funds to be returned. Even if his testimony was credible, and it was not, for a lawyer Mr. Feuerborn showed an amazingly cavalier attitude with regard to the hundreds of thousands of dollars that he received and distributed on behalf of Mr. Collingwood.

Almost none of the life insurance policy transactions for which Mr. Feuerborn held funds actually closed. Only the smallest transactions Mr. Feuerborn participated in—coincidentally, the transactions related to the Quality Investments Scheme—actually closed. The other dozen or so fell apart after Mr. Collingwood directed payment of the entire down payment to himself or for his benefit. Mr. Feuerborn testified that these buyers were unable to provide funds necessary to complete their purchases, an amazingly consistent failure taking into account the not-insignificant sums the buyers were apparently willing to give up merely to entertain the possibility of such a transaction. In only one case was a portion of the down payment returned to the potential purchaser. *See* Tr. Exh. 4.

It appears that on several occasions buyers tendered down payments that were not consistent with the very escrow agreements under which Mr. Feuerborn held such funds. *Compare* Tr. Exhs. 6, 8 (escrow agreements specifying purchase prices and down payment prices), *with* Tr. Exh. 4 (incoming wires which Mr. Feuerborn testified represented down payments).[5] From the circumstances, it appears that Mr. Collingwood and Mr. Feuerborn knowingly accepted inappropriate down payments from prospective buyers for transactions they knew would fail. In almost every case, Mr. Collingwood and Mr. Feuerborn (to a much

---

[5] Although Mr. Feuerborn testified that the escrow agreements were uniform, containing similar language, that is not entirely true. Some required a specific down payment of $50,000 to $100,000, which was generally paid. Others required a payment of 10% of the purchase price, with purchase prices ranging from $50,000,000 to $125,000,000. In the latter cases, buyers tendered $50,000 to $100,000, not the $5 to $12 million required.

smaller extent) paid themselves the sum total of the down payment funds.  There is no credible evidence to suggest that services were actually rendered in exchange for those payments and, by Mr. Feuerborn's own account, he never thought to ask the purpose of the substantial payments he made to or at the direction of Mr. Collingwood.[6]

Mr. Feuerborn testified that at no time did he represent as counsel Mr. Collingwood, Sunstar, or any buyer or seller in a transaction.  Rather, Mr. Feuerborn maintained that he represented "the transaction" as an independent escrow agent.  However, Mr. Feuerborn admitted that on at least one occasion he performed legal work on behalf of a potential buyer in order to form a corporate entity that would facilitate the intended transaction. Likewise, as previously noted, Mr. Feuerborn attempted to represent Mr. Collingwood and Sunstar before this Court in 2013 and 2014.  Mr. Feuerborn provided no explanation for these apparent conflicts of interest.

Although Mr. Feuerborn offered copies of several escrow agreements memorializing his role in the transactions, none of those agreements permit Mr. Feuerborn to make distributions based on the direction of only one party to the potential transaction.  To the contrary, the escrow agreements require bilateral consent prior to disbursement.  *See* Tr. Exhs. 6, 8.[7]  Based on the agreements before the Court, Mr. Feuerborn's disbursements to

---

[6] Mr. Feuerborn argued at the evidentiary hearing that he did not suspect malfeasance in large part because none of the prospective buyers ever complained when their transactions failed to close. Even if this explanation was credible, and it was not, it would not excuse Mr. Feuerborn's failure to fulfill his obligations as an independent escrow agent with duties to both the buyer and the alleged broker.

[7] The escrow agreement at Tr. Exh 6 contains the following clause: "the Parties agree and authorize ATTORNEY to receive and issue monies into escrow…and to use those funds as directed and authorized by the Parties."  The agreement defines "ATTORNEY" as Mr. Feuerborn's law practice, and defines "the Parties" to include both Sunstar and the purchaser.  The Court interprets the agreement to require the authorization of both Sunstar and the purchaser for use of the escrowed funds. Three of the four agreements contain language identical to that in Tr. Exh. 6. The document entitled "Deposit and Indemnity Agreement for Life Settlement Transaction," which functions as an escrow agreement, says "the Parties agree and authorize ATTORNEY to receive and use [the escrow funds] as directed and authorized by the Parties."  Likewise, the Court interprets that agreement to require the authorization of both Sunstar and the purchaser for use of the funds.

12

himself and to Mr. Collingwood violated the very escrow agreements formalizing his role in the transactions.

Although Mr. Feuerborn objected to the Trustee's characterization of him as Mr. Collingwood's personal banker, on one occasion at least he inarguably filled that role. With regard to one of the transactions about which Mr. Feuerborn provided documentation, the so-called "Battle Transaction," Mr. Feuerborn did not serve as the escrow agent, and in fact served no formal role in the transaction. *See* Tr. Exh. 7. Under the terms of the escrow agreement governing the Battle Transaction, another party served as escrow agent. That party was required to hold all funds in trust unless and until "all parties have signed documents requesting that the transfer be made, and Escrow Agent receives said documents." On December 18, 2014, Mr. Feuerborn received $75,000 related to the Battle Transaction, which he deposited into a trust account. On December 23, 2014, Mr. Feuerborn sent Mr. Collingwood $20,000 of those funds. At the evidentiary hearing, the Trustee asked Mr. Feuerborn to explain why he had taken receipt of the money and disbursed it at Mr. Collingwood's request. Mr. Feuerborn stated that "the course of business was, put the money here." Given the language of the escrow agreement and Mr. Feuerborn's testimony, the Court can only conclude that Mr. Feuerborn followed this "course of business" as a personal favor to Mr. Collingwood.

On another occasion, despite serving as a formal escrow agent for the so-called "Fidelis Transaction," Mr. Feuerborn made payments directly to third parties on Mr. Collingwood's behalf and at his direction. In April and May of 2014, Mr. Feuerborn paid $15,000 to "Craig Kelley." Tr. Exh. 4 (wire transfer designation). Craig Kelley, Esq. is a lawyer who appears regularly before this Court. At that time, Mr. Kelley and his law firm represented Mr. Collingwood and Sunstar in this bankruptcy proceeding and were defending them in connection with the Trustee's discovery requests. At the evidentiary

13

hearing, Mr. Feuerborn testified that he had assisted Mr. Collingwood in retaining Mr. Kelley for this case. Mr. Feuerborn stated that he knew of the Trustee's investigation at that time and knew that Mr. Kelley was being hired to defend Mr. Collingwood and Sunstar. Mr. Feuerborn's payment of funds directly to Mr. Kelley appears inconsistent with Mr. Feuerborn's testimony that he believed the disbursements to Mr. Collingwood represented payments due for services actually rendered to facilitate insurance policy transactions. Even if fees were due to Mr. Collingwood for services rendered, Mr. Feuerborn knowingly directed the funds to a third party as a personal favor to Mr. Collingwood. It appears that Mr. Feuerborn made the payments, knowing that Mr. Collingwood and Sunstar were under investigation, in such a manner as to hide the source of Mr. Collingwood's personal assets from Mr. Collingwood's own attorneys as well as from the Trustee.

At the evidentiary hearing, the Trustee asked "during all this time…you thought it was wise to take all of [Mr. Collingwood's] underwriting costs, which you'd never done before, put them in your trust account, and pay them…as instructed, just on an email from [Mr. Collingwood], not from the other party to the escrow agreement?" Mr. Feuerborn at first disputed the Trustee's characterization, before conceding "in a general sense, yes."

**Analysis**

In the Sanctions Motion, the Trustee requests that the Court exercise its inherent power to sanction Mr. Feuerborn for cause. The Trustee alleges that Mr. Feuerborn committed the following:

> (i) failed to advise the Trustee he was holding substantial estate funds and failed to turn over those assets,
> (ii) assisted Mr. Collingwood and Sunstar in thwarting the Trustee's efforts to obtain documents,
> (iii) refused to provide documents to the Trustee in response to subpoenas and Court orders,

14

(iv) hid assets of Mr. Collingwood, then surreptitiously funneled those assets to Mr. Collingwood, at a time when the Trustee was seeking and/or had obtained a judgment against Mr. Collingwood,

(v) continued to thwart the Trustee's efforts by failing to produce documents that might lead the Trustee to recover funds recently transferred from Mr. Feuerborn to Mr. Collingwood, and

(vi) continues to provide Mr. Collingwood with additional lead time to hide assets by further impeding the Trustee's efforts to track the monies that went from Mr. Feuerborn to Mr. Collingwood.

Sanctions Motion at 7. The Trustee requests sanctions in an amount to be determined by the Court.

Federal courts are vested with the "inherent power to control [their] proceedings and the conduct of the parties involved." *Glatter v. Mroz (In re Mroz)*, 65 F.3d 1567, 1574 (11th Cir. 1995). This inherent power includes the power to impose sanctions against attorneys and parties. *Chambers v. Nasco, Inc.,* 501 U.S. 32, 45-46 (1991). However, a high threshold must be satisfied in order for a court to impose sanctions under its inherent power. *Peer v. Lewis*, 606 F.3d 1306, 1314-15 (11th Cir. 2010). A court may impose such sanctions when it finds that a person "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. 32 at 45-46 (internal quotation marks omitted). Whereas Fed. R. Civ. P. 11 "imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith" in order to sanction a party under that rule, a court must find that a person subjectively engaged in bad faith conduct in order to sanction that person under the court's inherent power. *See In re Mroz*, 65 F.3d at 1576; *Chambers*, 501 U.S. 32 at 47 n.11.

A party's lack of "reasonable inquiry into the underlying facts" may constitute bad faith. *See In re Mroz*, 65 F.3d at 1576. A "finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument." *Barnes v. Dalton*, 158, F.3d 1212, 1214 (11th Cir. 1998).

15

In this case, Mr. Feuerborn argued that the evidence reflects a good faith "course of business" whereby he held money on behalf of all parties to a series of transactions and disbursed funds as authorized in payment for services rendered. But the only part of Mr. Feuerborn's testimony the Court found credible is that it was Mr. Feuerborn's "course of business" to hold money for Mr. Collingwood.

The Court finds that Mr. Feuerborn knew that he was violating the terms of the escrow agreements by disbursing funds based solely on the direction of Mr. Collingwood, without consultation or even notice to the other parties to those agreements. The Court finds that from January 2014 to November 2015, Mr. Feuerborn knowingly and intentionally held some $300,000.00 and directed it for Mr. Collingwood's personal use in order to shield it from the Trustee's investigation and the Court's orders sanctioning Mr. Collingwood and Sunstar. The Court finds that Mr. Feuerborn knowingly and intentionally failed to respond to the Trustee's subpoena and the Court's orders compelling production, and that such responses as were eventually tendered contained frivolous arguments and untruthful information. The Court finds that all of these actions were taken with the intent to assist Mr. Collingwood in hiding assets from the Trustee. All of these actions were in bad faith. The Court will use its inherent power to sanction Mr. Feuerborn.

Even if the Court were to find that Mr. Feuerborn's actions were not knowing and intentional, it would find that Mr. Feuerborn acted in bad faith under the prevailing legal standard. Assuming that Mr. Feuerborn did not realize he was facilitating fraud by Mr. Collingwood, which the Court does not believe, he was certainly capable of complying with the escrow agreements, reading, understanding and complying with subpoenas properly served on him, and reading, understanding and complying with orders of this Court. Mr. Feuerborn completely failed to comply with his legal obligations in this case, instead tendering purposely untruthful responses to the Trustee and the Court. Even if he did not

do so knowingly and intentionally, which the Court does not believe, he failed to make a "reasonable inquiry" under the circumstances, and so the Court would nonetheless find that he acted subjectively in bad faith.

Accordingly, the Court will grant the Sanctions Motion.

**Amount of Sanctions**

The Court will require Mr. Feuerborn to pay the Trustee a sanction in an amount sufficient to fully compensate the bankruptcy estate for harm caused by Mr. Feuerborn's bad faith towards the estate. The sanction will have two components. First, Mr. Feuerborn must pay to the Trustee an amount equal to the legal fees and costs incurred by the Trustee in pursuit of the Sanctions Motion itself. The Court will determine this amount in a future order following the filing of an affidavit by the Trustee. Mr. Feuerborn will be provided an opportunity to challenge the reasonableness of such fees and expenses. Second, Mr. Feuerborn must pay to the Trustee an amount representing harm suffered by the estate as a result of Mr. Feuerborn's improper transfers of funds to Mr. Collingwood and Sunstar. Mr. Feuerborn caused direct harm to the estate by acting on behalf of Mr. Collingwood to shield funds he knew to be collectible by the estate. Accordingly, the Court will award a sanction in the amount of funds that were simultaneously collectible by the estate and withheld by Mr. Feuerborn on behalf of Mr. Collingwood and Sunstar.

The first harm to the estate arose in January, 2014. On January 9, 2014, Mr. Feuerborn obtained actual knowledge of this Court ordering sanctions against Sunstar in the amount of $7,626.00. That amount was later increased to $26,202.50 as a result of the Court's order at ECF No. 761. By that same order, the Court sanctioned Sunstar an additional $14,700. In total, prior to entry of final judgment against Sunstar and Mr.

Collingwood, the Court sanctioned Sunstar and Mr. Collingwood a total of $40,902.50.[8]
Sunstar and Mr. Collingwood paid no portion of that sanction.  During that period, Mr.
Feuerborn held and paid to Mr. Collingwood an amount in excess of $71,000, in addition to
payments to himself.  *See* Tr. Exhs. 1, 4 (showing wire transfers to Mr. Collingwood totaling
$71,000 between October 3, 2014 and December 8, 2014).  If Mr. Feuerborn had properly
complied with the Trustee's discovery requests and orders of this Court, the Trustee would
have obtained access to such funds in payment of amounts owing by Sunstar and Mr.
Collingwood.  Accordingly, between January and December, 2014, Mr. Feuerborn caused
the loss of $40,902.50 to the estate.

On December 8, 2014, the Court entered final judgment against Sunstar in an
amount in excess of $1,600,000, which amount soon thereafter became collectible also
against Mr. Collingwood.  Between December 8, 2014 and November 6, 2015, the latest
wire transfer for which the Trustee provided evidence, Mr. Feuerborn held and paid to Mr.
Collingwood the aggregate sum of $213,312.00.  Tr. Exh. 1.  Mr. Feuerborn paid to himself
$6,000.00 without authorization during this period, for services rendered in furtherance of
Mr. Collingwood's fraud upon this Court.  *See* Tr. Exh. 4.  All of those funds would have
been available to the Trustee to satisfy the obligations of Sunstar and Mr. Collingwood.
Accordingly, between December, 2014 and November, 2015, Mr. Feuerborn caused the loss
of $219,312.00 to the estate.

---

[8] The Court need not distinguish which sums were collectible against Sunstar as opposed to Mr.
Collingwood, individually, at a given time.  Mr. Feuerborn held the funds on behalf of both parties
and paid them to whatever party Mr. Collingwood directed.  Mr. Feuerborn's own trust account
ledgers document transfers to both Sunstar and Mr. Collingwood, and both the bank records in
evidence and Mr. Feuerborn's testimony suggest no distinction between Mr. Collingwood and
Sunstar.  Indeed, it is clear to the Court that Mr. Collingwood was the ultimate recipient or
beneficiary of all the payments.  If Mr. Feuerborn held funds at a time when the the Trustee had a
legal right to collect against either party, Mr. Feuerborn caused harm to the bankruptcy estate by
failing to reveal the existence of the assets he held.

In total, Mr. Feuerborn withheld from the Trustee information regarding the availability of at least $260,214.50 during periods in which that sum was collectible by the estate. Mr. Feuerborn will be responsible to the estate for this loss, in addition to amounts due in compensation of the Trustee for fees and expenses incurred in the preparation and prosecution of the Sanctions Motion.

**The Contempt Motion**

On January 21, 2016, the Court held a hearing on its Order to Show Cause [ECF No. 1250] requiring cooperation with the Trustee's discovery efforts and payment of certain sanctions. At that hearing, Mr. Feuerborn and the Trustee indicated that they had agreed to a form of order by which Mr. Feuerborn would cooperate with the Trustee's investigation. The Court thereupon entered its *Order on Order to Show Cause Directed to the Law Offices of Arthur Mark Feuerborn & Associates and Arthur Mark Feuerborn* [ECF No. 1289] (the "Agreed Order"), reflecting the agreement of the parties. The Agreed Order required Mr. Feuerborn to produce, no later than February 15, 2016, all bank account records, escrow agreements, trust account ledgers, email and other correspondence, wire transfer records, and any other documents relating to Mr. Collingwood or Sunstar.

Mr. Feuerborn did not comply with the Agreed Order. On February 22, 2016, Mr. Feuerborn had produced no documents to the Trustee as required by the Agreed Order. The Trustee then filed the Contempt Motion [ECF No. 1297]. In the Contempt Motion, the Trustee requests that the Court hold Mr. Feuerborn in contempt for violating the Agreed Order, and that the Court direct Mr. Feuerborn to pay the Trustee's attorneys' fees and costs in addressing Mr. Feuerborn's noncompliance. Mr. Feuerborn did not file a written response to the Contempt Motion.

Prior to the hearing on the Contempt Motion, Mr. Feuerborn produced some additional documents to the Trustee. These documents included a list of sixteen (16)

19

transactions involving Mr. Collingwood and Sunstar in which Mr. Feuerborn said he was involved. Tr. Exh. 4. Mr. Feuerborn also provided copies of six (6) escrow agreements relating to some of those transactions. Tr. Exhs. 6-8. Mr. Feuerborn could not explain the apparent absence of ten escrow agreements, although he did testify that the missing agreements likely contained substantially the same language as four of the agreements provided.

Notably, Mr. Feuerborn provided a number of the required documents only on March 15, 2016, in person at the first evidentiary hearing on the Feuerborn Motions. As a result, the Court continued the hearing in order to provide the Trustee adequate time to review the information. Mr. Feuerborn's failure to comply even after he had specifically agreed to do so thus further increased the cost to the bankruptcy estate.

At the continued evidentiary hearing on April 8, 2016, the Trustee argued that Mr. Feuerborn was intentionally concealing additional responsive materials. For instance, the Trustee noted that the emails provided by Mr. Feuerborn documenting requests for wire transfers to Mr. Collingwood could account for only some of the wire transfers. The Trustee doubted that Mr. Feuerborn had produced all responsive correspondence. Mr. Feuerborn denied the allegation. In light of the generally evasive nature of Mr. Feuerborn's testimony, and his continued actions over a period of years to stymie the Trustee's investigation and collection efforts, the Court doubts that he has provided all of the responsive correspondence to the Trustee.

Mr. Feuerborn's assertion that he had attempted to comply with the Agreed Order in good faith was not credible. It should be noted that Mr. Feuerborn specifically agreed to the terms of the Agreed Order, including the stated deadline for delivery of responsive documents. Even Mr. Feuerborn's partial compliance with the order was not timely. As an attorney, Mr. Feuerborn fully understood the requirement to produce, for instance, "all

escrow agreements relating to [Sunstar] and/or Reed Collingwood." When the Trustee asked why Mr. Feuerborn had produced only some of the escrow agreements he insisted were executed in connection with each of the transactions, Mr. Feuerborn stated only that he had copied all of the materials from the appropriate files in his possession. To the extent that some materials, such as ten of the escrow agreements, were obviously missing, he offered no explanation.

The Court finds that Mr. Feuerborn failed to comply with the Agreed Order by tendering only some of the documents he agreed to provide and, in any case, providing them after the agreed deadline. Accordingly, the Court will grant the Contempt Motion, will hold Mr. Feuerborn in contempt of court, and will require Mr. Feuerborn to pay as a sanction the fees and costs incurred by the Trustee in pursuit of the Contempt Motion.

**The Motion to Compel**

By early 2016 the Court had entered several orders, described above, sanctioning Mr. Feuerborn for his behavior in this case. As a result, Mr. Feuerborn owed the Trustee many thousands of dollars for attorney fees and costs incurred as a result of Mr. Feuerborn's steadfast refusal to cooperate with the Trustee's investigation. The Trustee thus began to conduct discovery into Mr. Feuerborn's finances to facilitate collection on the sanction orders.

On February 4, 2016, the Trustee served Mr. Feuerborn with the *Trustee's Request for Production of Documents Directed to Arthur Mark Feuerborn* [Motion to Compel, ECF No. 1307, Exh. A] (the "Production Request"). The Production Request included requests for Mr. Feuerborn's personal financial information, including bank accounts, investment accounts, loan applications, credit card statements, deeds and mortgage records, vehicle title records, itemized lists of jewelry and other assets, and other related documents.

Pursuant to Fed. R. Bankr. P. 7034, Mr. Feuerborn was to respond to the Production Request no later than March 7, 2016.

Mr. Feuerborn did not produce any documents by the deadline. On March 10, 2016, he sent some documents to the Trustee in partial and untimely compliance with the Production Request and the Agreed Order. Accordingly, the Trustee filed the Motion to Compel, requesting that the Court compel compliance with the Production Request and further sanction Mr. Feuerborn for attorneys' fees and costs incurred in connection with the motion. Mr. Feuerborn did not file a written response to the Motion to Compel.

In his testimony, Mr. Feuerborn offered substantially no response to the allegations contained in the Motion to Compel. At the continued hearing on April 8, 2016, Mr. Feuerborn conceded that a number of responsive documents existed and had not been produced. These documents related most notably to a retirement account and a mortgage transaction on the house in which he resides. Although Mr. Feuerborn stated that certain of the other requested documents did not exist, he has never served a formal response to the Production Request to that effect.

Mr. Feuerborn argued that his failure to respond to the Production Request was in part due to difficulty in copying, scanning and preparing transmissions to the Trustee's counsel. Mr. Feuerborn is a practicing lawyer and there was ample time for him to respond to the Production Request. Indeed, Mr. Feuerborn admitted in closing arguments that there was no valid excuse for his failure to respond to the Production Request. Accordingly, the Court will grant the Motion to Compel by requiring Mr. Feuerborn to pay as a sanction the fees and costs incurred by the Trustee in its pursuit.

**Conclusion**

For the foregoing reasons, it is ORDERED AND ADJUDGED that:

1.      The Sanctions Motion [ECF No. 1264] is GRANTED.

2.      Mr. Feuerborn shall pay to the Trustee a sanction in the amount of $260,214.50, representing funds that Mr. Feuerborn concealed from the Trustee on behalf of himself, Reed Collingwood, and Sunstar, thereby preventing the Trustee from collecting the same on account of legal obligations of those parties to the estate.  The sum of $260,214.50 shall be immediately due and payable by Arthur Mark Feuerborn to the Trustee, for which let execution issue.

3.      The Contempt Motion [ECF No. 1297] is GRANTED.  The Court holds Arthur Mark Feuerborn in CONTEMPT OF COURT for violation of the Agreed Order [ECF No. 1289].

4.      The Motion to Compel [ECF No. 1307] is GRANTED.  Mr. Feuerborn shall fully comply with the Trustee's Production Request no later than 5:00 pm EST on May 23, 2016 by producing (1) all extant documents requested by the Trustee therein, and (2) a written response to the Production Request consistent with the requirements of the applicable Federal Rules of Bankruptcy Procedure.

5.      Mr. Feuerborn shall pay to the Trustee an additional sanction in an amount reflecting the Trustee's attorneys' fees and costs incurred in preparation and prosecution of the Feuerborn Motions, to the extent not previously ordered.  No later than May 23, 2016, the Trustee shall file an affidavit with the Court attesting to the amount of attorneys' fees and costs incurred in preparation and prosecution of the Feuerborn Motions, to the extent not previously ordered.  No later than May 30, 2016, Mr. Feuerborn may file with the Court a response to the affidavit addressing only the reasonableness of the fees and expenses set

out therein.  After review of the same, the Court will enter a further order directing Mr.

Feuerborn to pay a specified sum to the Trustee by a specified date.

###

Copies furnished to:

Leslie Gern Cloyd, Esq.

*Leslie Gern Cloyd, Esq. is directed to serve a conformed copy of this order on all appropriate parties and file a certificate of service with the Court.*